# United States Court of Appeals for the Federal Circuit

_____

**SAN CARLOS APACHE TRIBE,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

_____

2010-5102

_____

Appeal from the United States Court of Federal Claims in Case No. 09-CV-046, Senior Judge Robert H. Hodges, Jr.

_____

Decided: April 25, 2011

_____

WILLIAM P. HORN, Birch Horton Bittner and Cherot, P.C., of Washington, DC, argued for plaintiff-appellant. Of counsel on the brief was STEVEN M. TITLA, Titla & Parsi, PLLC, of Globe, Arizona. Of counsel was KEVIN L. PARSI, Titla & Parsi, PLLC, of Scottsdale, Arizona.

TAMARA N. ROUNTREE, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued defendant-appellee. With her on the brief was IGNACIA S. MORENO, Assistant Attorney General.

Before NEWMAN, LOURIE, and MOORE, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* LOURIE.
Dissenting opinion filed by *Circuit Judge* NEWMAN.

LOURIE, *Circuit Judge.*

The San Carlos Apache Tribe ("Tribe") appeals from a decision of the United States Court of Federal Claims, which dismissed the Tribe's monetary damages claim against the United States for an alleged breach of fiduciary duty relating to water rights in the Gila River. Because the Court of Federal Claims correctly granted the government's motion to dismiss the Tribe's claim for lack of jurisdiction, we affirm.

## BACKGROUND

The San Carlos Apache Reservation borders the Gila River. Compl. at 1; *see also In re the Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 127 P.3d 882, 885 (Ariz. 2006) ("*Gen. Adjudication*"). The river flows in a westerly direction across Arizona through semi-arid and desert lands requiring irrigation for successful agricultural or horticultural use. *Gen. Adjudication*, 127 P.3d at 885 n.1. In 1925, in connection with a federal project to dam the Gila River and provide water to surrounding landowners, the United States filed a complaint on behalf of the Tribe and other parties in the United States District Court for the District of Arizona to obtain a declaration of water rights to the Gila River (the "Globe Equity Litigation"). *See San Carlos Apache Tribe v. United States*, No. 09-46, at 1 (Fed. Cl. Mar. 25, 2010) ("*Op.*").

In 1935, following ten years of litigation, the district court approved a settlement among the parties; the con-

sent decree is known as the "Globe Equity Decree" ("Decree"). *Id.* The Decree grants the Tribe 6,000 acre-feet of water from the Gila River each irrigation season for irrigating 1,000 acres of land. *Id.*; Answering Br. Def.-Appellee at A36, 2010 WL 3758727 ("Appellee Br."). The Decree states that the parties have "concluded and settled all issues" pertaining to Gila River water rights. *Op.* at 1; *see also* Appellee Br. at A26. The Decree further states that the parties' settlement is "embodied in and confirmed and made effective by" the Decree, which "defin[es] and adjudicat[es] the[] claims and rights" of the parties. Appellee Br. at A26. In addition, the Decree states:

> That each and all of the parties to whom rights to water are decreed in this cause (and the persons, estates, interests and ownerships represented by such thereof as are sued in a representative capacity herein), their assigns and successors in interest, servants, agents, attorneys and all persons claiming by, through or under them and their successors, are hereby forever enjoined and restrained from asserting or claiming—as against any of the parties herein, their assigns or successors, or their rights as decreed herein—any right, title or interest in or to the waters of the Gila River, or any thereof, except the rights specified, determined and allowed by this decree, and each and all thereof are hereby perpetually restrained and enjoined from diverting, taking or interfering in any way with the waters of the Gila River or any part thereof . . . .

*Id.* at A51.

The government filed another water rights claim on behalf of the Tribe in 1979. *Op.* at 2; *see also Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 558 (1983).

Eventually, this claim was consolidated with other parties' water rights claims in the Gila River general stream adjudication ("Arizona Adjudication") in Arizona state court. *See Gen. Adjudication*, 127 P.3d at 886. In 2001, certain parties to the Arizona Adjudication asserted that the Tribe's water rights claims were barred by the *res judicata* effect of the Decree. *Id.* In response, the Tribe argued that it is not bound by the Decree, because it was not in privity with the United States in the Globe Equity Litigation. *Id.* at 896. The Tribe also argued that, in the litigation leading to the Decree, the United States as trustee for the Tribe sought water rights only under the theory of prior appropriation; thus, the Decree does not cover the Tribe's aboriginal water rights or federal reserved ("*Winters*") water rights. *Id.* at 888; *see also Winters v. United States*, 207 U.S. 564, 576-77 (1908); A. Dan Carlock, Law of Water Rights and Resources § 9:39 (2010).

The matter was appealed to the Arizona Supreme Court, which in 2006 declined on the basis of comity to consider the Tribe's argument that the Decree is not binding on the Tribe. *Gen. Adjudication*, 127 P.3d at 901. In essence, the court held that the proper forum for challenging the interpretation and enforcement of the Decree was the United States District Court for the District of Arizona, not Arizona state court.[1] *Id.* at 900-01. The Arizona Supreme Court further held that the Decree resolved all of the Tribe's water rights, under all theories,

---

[1] The Arizona Supreme Court noted that the Tribe had received permission to intervene in an ongoing litigation in the United States District Court for the District of Arizona over enforcement of the Decree, but that the Tribe had "declared that it 'does not seek to litigate rights to additional Gila River water in this matter.'" *General Adjudication*, 127 P.3d at 900.

and thus precludes any further claim by the Tribe to the waters of the Gila River. *Id.* at 895. The Arizona Supreme Court noted that it "express[ed] no opinion as to what other remedies, if any, might be available to the Tribe for the Government's allegedly inadequate representation." *Id.* at 901 n.21.

On January 23, 2009, the Tribe filed a complaint in the United States Court of Federal Claims for monetary damages. The Tribe alleged that "[t]he United States' inadequate representation and failure to secure and protect the [Tribe's] aboriginal and federal reserved water rights under the Decree for a permanent Tribal homeland constitutes a serious breach of fiduciary duty which it owed to the [Tribe]." Compl. at 4. The Tribe asserted that its claim against the United States for monetary damages did not become ripe until the 2006 decision of the Arizona Supreme Court. *Id.* at 18.

The government filed a motion to dismiss for lack of jurisdiction, arguing, *inter alia*, that the Tribe's claim is barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501. Def.'s Mot. to Dismiss at 1. The Court of Federal Claims granted the government's motion to dismiss. *Op.* at 3. The court held that the Tribe's claim against the government accrued in 1935 upon entry of the Decree and that it was therefore barred by the six-year statute of limitations. *Id.*

The Tribe timely appealed from the court's decision to dismiss its claim. We have jurisdiction over final judgments of the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3).

### DISCUSSION

The statute of limitations provided by 28 U.S.C. § 2501 is jurisdictional in the Court of Federal Claims.

*John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988) ("The 6-year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed."). Whether the Court of Federal Claims possesses jurisdiction over a claim is a question of law subject to *de novo* review. *Western Co. v. United States*, 323 F.3d 1024, 1029 (Fed. Cir. 2003). In reviewing the propriety of the court's dismissal, we accept as true the facts alleged in the Tribe's complaint. *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1568-69 (Fed. Cir. 1993).

An action brought under the Tucker Act is time-barred unless it is "filed within six years of the date that the cause of action accrued." *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995); *see also* 28 U.S.C. § 2501 (2006) ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). A cause of action against the government has first accrued "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Hopland Band*, 855 F.2d at 1577 (emphasis omitted). Moreover, "[t]he question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." *Fallini*, 56 F.3d at 1380. This objective standard applies to the accrual of a claim for breach of fiduciary duty. *See Jones v. United States*, 801 F.2d 1334, 1335 (Fed. Cir. 1986) ("Generally, an action for breach of fidu-

ciary duty accrues when the trust beneficiary knew or should have known of the breach.").

On appeal, the Tribe argues that the Court of Federal Claims erred by dismissing its claim. The Tribe asserts that its claim against the government accrued in 2006 following the decision of the Arizona Supreme Court, and is therefore within the six-year statute of limitations under 28 U.S.C. § 2501. The Tribe contends that, due to the government's legally inadequate representation of the Tribe in the Globe Equity Litigation, it was not clear until 2006 that the Tribe was in fact bound by the Decree.

The Tribe also argues that the scope of the Decree remained unclear until the Arizona Supreme Court held that the Decree precluded any claims by the Tribe for additional water rights from the Gila River. The Tribe points out that the United States, as trustee for the Tribe, continued to support the Tribe's claims for additional water rights until 2006, and the Tribe contends that it had no notice that the Decree precluded additional water rights. The Tribe thus argues that, as a beneficiary, it was entitled to rely on the government's good faith and expertise without having to sue for money damages prior to the 2006 Decision. Further, the Tribe argues that because the government did not repudiate its role as the Tribe's trustee until 2006, the Tribe's claim for breach of fiduciary duty did not begin to accrue until then.

The government argues that the Tribe's claim is untimely and barred by the statute of limitations. The government contends that a claim against a trustee for breach of trust accrues when the beneficiary objectively knew or should have known of the breach. The government points out that the basis of the Tribe's present claim is the plain language of the Decree itself, demonstrating that the Tribe's claim was "inherently knowable" to the

Tribe in 1935. Appellee Br. at 11. The government further argues that the decision of the Arizona Supreme Court in 2006 did not fix the basis of the Tribe's claim; at most, the decision clarified the possible damages associated with the claim. Therefore, the government argues, the Arizona Supreme Court's decision did not affect whether the Tribe knew or should have known that its claim existed.

We agree with the government that the Court of Federal Claims lacked jurisdiction over this case because the Tribe's claim is barred by the statute of limitations. The Tribe's complaint asserts jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). As noted above, an action brought under the Tucker Act is time-barred unless it is filed within six years of the date that the cause of action accrued. The central question in this case is when the Tribe's claim for breach of fiduciary duty accrued. We conclude that the Tribe's claim accrued in 1935 upon entry of the Decree. As we shall explain, our conclusion is compelled by the plain terms of the Decree and is consistent with the Tribe's own concessions in its complaint and appellate brief.

It is objectively evident that all of the events that fixed the government's alleged liability and entitled the Tribe to institute an action against the government occurred upon entry of the Decree in 1935. The Tribe's claim is based on the unsatisfactory water rights to which the government stipulated in the Decree. Specifically, the Tribe asserts that it was inadequately represented because the United States failed to obtain aboriginal or federal reserved water rights. Compl. at 18-19. However, the terms of the Decree plainly and objectively indicate which water rights the Tribe did and, importantly, did not receive following the settlement of the Globe Equity Litigation. The Decree does not expressly grant any

aboriginal or federal reserved water rights to the Tribe, and, as the Tribe acknowledges, the Decree plainly identifies the Tribe as represented by the United States in the Globe Equity Litigation, grants the Tribe a total of 6,000 acre feet of water rights, and includes a provision in Article XIII stating that "each and all of the parties to whom rights to water are decreed in this cause . . . are hereby forever enjoined and restrained from asserting or claiming . . . any right, title or interest in or to the waters of the Gila River, or any thereof, except the rights specified, determined and allowed by this decree." Appellee Br. at A51. Accordingly, viewed under an "objective standard," *Fallini*, 56 F.3d at 1380, the Tribe knew or should have known that the terms of the Decree precluded the Tribe from seeking additional Gila River water rights.

The Tribe further contends that the government's inadequate representation and its resulting breach of fiduciary duty arose from a "severe conflict of interest" due to the government's representation of multiple parties in the Globe Equity Litigation. Compl. at 15. The facts supporting the alleged conflict of interest, however, were similarly apparent from the text of the Decree, which, viewed objectively, plainly indicated that the United States represented multiple parties in the Globe Equity Litigation. As of 1935, therefore, the Tribe was objectively on notice of the accrual of its claims against the government.[2]

---

[2] Even if the Tribe was unaware of its legal rights at the time the Decree was implemented, we have held that "[i]t is settled . . . that 28 U.S.C. § 2501 is not tolled by the Indians' ignorance of their legal rights." *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 720-21 (Fed. Cir. 1984) (emphasis omitted).

It is also evident from the Tribe's complaint and appellate brief that the basis for its claim in this case is the language of the Decree itself. For example, the Tribe's complaint acknowledges that the government's alleged breach of fiduciary duty was apparent from the fact that the Decree provides for only 6,000 acre-feet for the Tribe:

> The United States' denial of any benefits to the Apaches from the San Carlos Project was part of a consistent pattern of discrimination against the Tribe, and breach of fiduciary duty, that would be demonstrated again in the Globe Equity proceeding when the United States stipulated to only 6,000 acre feet of Gila River water for the Tribe.

Compl. at 10.[3] This is further apparent from the Tribe's appellate brief, which concedes, for example, that the government's "breach of trust is also manifested in many of the terms of the Decree that provided the Tribe virtually worthless limited irrigation rights while providing substantially greater more valuable rights to others." Opening Br. San Carlos Apache Tribe at 30, 2010 WL 2603457 ("Appellant Br.").

The Tribe also asserts that its claim arises from the government's failure to stipulate to "substituted" water rights for the Tribe, despite having done so for other parties to the decree. The complaint states the following:

> The U.S. also stipulated to substantial water rights to benefit the Upper Valley farmers under

---

[3] The Tribe's complaint also acknowledges that "[t]he 6000 acre feet of water decreed to the Tribe in 1935 from the Gila River was a mere pittance of water and is truly *de minimis* compared to the amount of water stipulated to by the United States under the Decree for other parties to the Decree." Compl. at 2.

the Decree.  These farmers upstream from San Carlos who had entered the Upper Valley lands starting in the early 1880's, were provided a special "substituted" storage right under Article VIII of the Decree based on the amount of water stored each year in the San Carlos Reservoir. . . .

The United States utterly failed to secure comparable water rights for the [Tribe].  It limited the Tribe to a mere 6,000 acre feet from the Gila, and made no similar effort to established [sic] "substituted" storage rights for the Tribe based upon water stored in the Reservoir, even though the Reservoir is located within the heart of the [Tribe's] Reservation, and even though the United States was legally obligated under its fiduciary duties to act as the Tribe's trustee in securing its federal reserved water rights under the Decree.

Compl. at 12.  Thus, with regard to "substituted" water rights, the Tribe again concedes that the government's alleged breach of fiduciary duty is apparent from the terms of the Decree.  Regarding the alleged conflict of interest, the Tribe's complaint acknowledges that the Decree itself indicates that the United States agreed to a negotiation that provided water rights for multiple parties including the Tribe.  *Id.* at 15-16.

Finally, in connection with the Tribe's allegation that the government breached its duty to adequately represent the Tribe in actions to obtain sufficient water rights to fulfill the Tribe's aboriginal and federal reserved water rights, *id.* at 4, the complaint references a provision of the Decree granting the Upper Valley farmers (another party to the Decree) a limited right to purchase the Tribe's 6,000 acre-feet for a specified sum.  According to the Tribe, "[t]his agreement under the Decree . . . clearly

provides evidence beyond any reasonable doubt that the government officials representing the Tribe in Globe Equity never had any intention to secure aboriginal or federal reserved water rights for the Tribe under the Decree, as required under federal law." *Id.* at 12-13. Again, consistent with our conclusion that the Tribe's claim accrued in 1935, the facts supporting the Tribe's claim arise from the terms of the Decree itself.

We are not persuaded by the Tribe's arguments to the contrary. In support of its contention that its claim against the United States accrued in 2006, the Tribe relies on *Samish Indian Nation v. United States*, in which we stated that, "[i]f a necessary element to a claim must be established in a different forum, the claim will not accrue for § 2501 until that element is finally established in the other proceeding." 419 F.3d 1355, 1369 (Fed. Cir. 2005). The Tribe contends that, in 2006, the Arizona Supreme Court decided a "necessary element" to its claim, *viz.*, "that the Tribe was precluded from asserting its *Winters* and aboriginal water rights to the main stem of the Gila River." Appellant Br. at 27.

*Samish* is not controlling in this case, however. In *Samish*, the Interior Department dropped the Samish in 1969 from its list of federally recognized tribes. In 1996, following a series of administrative and judicial proceedings, a federal district court ruled that the government's refusal to federally recognize the tribe violated the Samish's due process rights and the Administrative Procedure Act ("APA"). *Id.* at 1362. In 2002, the Samish filed suit in the Court of Federal Claims seeking, *inter alia*, monetary damages for lost benefits resulting from the government's wrongful refusal to accord federal recognition to the Samish during the period of 1969 to 1996. *Id.* at 1363.

In relevant part, the opinion of the Court of Federal Claims dismissed the Samish's claims as time-barred under 28 U.S.C. § 2501, reasoning that the Samish's claims accrued in 1969. *Id.* We reversed that part of the court's decision and held that the tribe's claim for retroactive benefits did not accrue until 1996, because "the district court's determination [in 1996] provides a predicate 'wrongful' element in this action." *Id.* at 1374. We pointed out that "[o]nly a district court, acting on a challenge under the APA, has authority to review the Secretary's acts concerning the executive's recognition determination." *Id.* at 1369. Because the district court's 1996 decision provided the "missing element," *id.*, to the Samish's claim for damages against the government, the Samish's claim accrued in 1996; its complaint filed in 2002, less than six years later, was timely.

Accordingly, in *Samish*, a money damages claim for improperly withheld federal recognition between 1969 and 1996 required, as a "necessary element," a district court's determination in 1996 that federal recognition was in fact improperly withheld during that period. In contrast, in the present case, the Tribe's claim required no further legal determination beyond the Decree itself. As discussed above, the government's alleged liability was objectively fixed in 1935 with the plain language of the Decree. Here, unlike in *Samish*, there was no "necessary element . . . [to] be established in a different forum," *id.*, before the Tribe's claim accrued under § 2501. The decision of the Arizona Supreme Court, rather than providing a necessary element to the Tribe's claim, simply stated what was readily apparent from the face of the 1935 Decree.

More germane to the present case is *Catawba Indian Tribe v. United States*, 982 F.2d 1564 (Fed. Cir. 1993). That case involved a dispute stemming from the enact-

ment of the Termination Act in 1962. *Catawba*, 982 F.2d at 1567. As the Supreme Court of the United States ruled in 1986, the Act rendered the ancestral lands of the Catawba subject to South Carolina's adverse possession laws. *Id.* at 1568 (citing *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498 (1986)). The Catawba sued the United States in 1990, claiming, among other things, that the government, as trustee for the Catawba, breached its fiduciary duty to the Catawba. *Id.* Specifically, the Catawba alleged that the government failed to protect its land claim by breaching a duty to notify it of the legal effect of the Act. *Id.* The Catawba also asserted that its claim did not accrue upon enactment of the Act because, allegedly, the government incorrectly assured the tribe that nothing in the Act would affect the tribe's claim to its ancestral lands. *Id.* at 1568.

The Court of Federal Claims dismissed the Catawba's claim as time-barred, and we affirmed. We held that the Catawba's claim accrued in 1962 when the Act was adopted. *Id.* at 1570-71. We rejected the Catawba's argument that its claim did not accrue until the Supreme Court's ruling in 1986:

> While the Supreme Court's pronouncement in 1986 might be relevant to fixing the time when the Tribe *subjectively* first knew what the Act meant, it is fundamental jurisprudence that the Act's *objective* meaning and effect were fixed when the Act was adopted. Any later judicial pronouncements simply explain, but do not create, the operative effect.

*Id.* at 1570. We further explained that the Supreme Court's holding in 1986 that the Act was unambiguous on its face merely reinforced the conclusion that the Ca-

tawba's claim accrued in 1962 upon enactment of the Act. *Id.*

Here, as the Tribe correctly asserts, the Arizona Supreme Court held in 2006 that the Tribe was bound by the terms of the Decree. However, like the Supreme Court in *Catawba*, the Arizona Supreme Court based its decision on the unambiguous language of the legal instrument fixing the alleged liability—the 1935 Decree. For example, in reviewing the language of the Decree and determining that the Tribe was bound by its terms, the Arizona Supreme Court, foreshadowing our present decision, stated that "[i]t is difficult to imagine more explicit language indicating that the Decree was intended to resolve all of the parties' claims to the Gila River mainstem." *Gen. Adjudication*, 127 P.3d at 895. As in *Catawba*, where we held that "the 'damage' was done when the Act became effective in 1962," 982 F.2d at 1571, we hold here that the government's liability was fixed upon entry of the Decree in 1935. Also, like the alleged incorrect assurances by the government in *Catawba*, the government's continued support of the Tribe's water rights claims following entry of the Decree does not alter the fact that the terms of the Decree objectively fixed the Tribe's claim in 1935.

The Tribe further argues that its claim did not accrue until 2006 because, "[u]ntil the full extent and permanency of harm is objectively known, a claim does not accrue." Appellant Br. at 28. The Tribe thus contends that the decision in 2006 of the Arizona Supreme Court clarified for the first time the extent of the damages associated with the Tribe's claim against the government for inadequate representation in the Globe Equity Litigation.

We disagree. We have "soundly rejected" the notion "that the filing of a lawsuit can be postponed until the full extent of the damage is known." *Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000) (discussing *United States v. Dickinson*, 331 U.S. 745 (1947)). We recently confirmed this legal principle in *Navajo Nation v. United States*, where we stated that, "for purposes of determining when the statute of limitations begins to run, the 'proper focus' must be 'upon the time of the [defendant's] acts, not upon the time at which the *consequences* of the acts [become] most painful.'" 631 F.3d 1268, 1277 (Fed. Cir. 2011) (quoting *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)). Even if, as the Tribe contends, the full extent of the damages associated with the government's alleged breach of trust was not certain until 2006, all of the facts relevant to the Tribe's claim were known as of 1935. *See Catawba*, 982 F.2d at 1572. We therefore disagree with the Tribe's assertion that its claim accrued in 2006.

As a final matter, the Tribe argues that its claim is timely because it was not until 2006 that the United States "definitively repudiated its role of trustee" for the Tribe. Appellant Br. at 37. Because the Tribe did not raise this argument before the Court of Federal Claims, it is waived on appeal. *See Corus Staal BV v. United States*, 502 F.3d 1370, 1378 n.4 (Fed. Cir. 2007) (treating as waived an argument made for the first time on appeal); *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("[T]his court does not 'review' that which was not presented to the district court.").

However, even if this argument were timely presented, we do not find it persuasive. The Tribe refers us only to *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1348 (Fed. Cir. 2004), a case concerning the alleged

mismanagement of trust funds by the United States as trustee for the Shoshone. In that case, we explained:

> The beneficiary, of course, may bring his action as soon as he learns that the trustee has failed to fulfill his responsibilities. It is often the case, however, that the trustee can breach his fiduciary responsibilities of managing trust property without placing the beneficiary on notice that a breach has occurred. It is therefore common for the statute of limitations to not commence to run against the beneficiaries until a final accounting has occurred that establishes the deficit of the trust.

*Shoshone*, 364 F.3d at 1348 (citation omitted).

Relying on *Shoshone*, the Tribe argues that not until a trustee repudiates the trust and the beneficiary is aware of that repudiation does a claim for breach of fiduciary duty accrue. However, *Shoshone* involved a situation where the trustee allegedly breached its duty by mismanaging trust funds "without placing the beneficiary on notice that a breach has occurred." *Id.* In such cases, a "final accounting" is necessary to put the Tribe on notice of the breach. *Id.* In the present case, in contrast, a "final accounting" was unnecessary to put the Tribe on notice of the accrual of its claim: the plain terms of the Decree were objectively sufficient to notify the Tribe of the alleged breach, as we have explained above.

We conclude that the government's alleged liability for breaching its fiduciary duty to the Tribe was objectively fixed upon entry of the Decree in 1935, and that the Tribe "knew or should have known," *Jones*, 801 F.2d at 1335, upon entry of the Decree that the government's breach occurred. As we explained *supra*, our conclusion is compelled by the plain language of the Decree, which states in part:

"[t]hat each and all of the parties to whom rights to water are decreed in this cause (and the persons, estates, interests and ownerships represented by such thereof as are sued in a representative capacity herein) . . . are hereby forever enjoined and restrained from asserting or claiming . . . any right, title or interest in or to the waters of the Gila River, or any thereof, except the rights specified, determined and allowed by this decree."

Appellee Br. at A51. Therefore, the Tribe's claim is barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501. Because the Tribe's claim is time-barred, the Court of Federal Claims did not legally err by granting the government's motion to dismiss the Tribe's claim for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the United States Court of Federal Claims granting the government's motion to dismiss the Tribe's complaint.

## AFFIRMED

# United States Court of Appeals
# for the Federal Circuit

---

**SAN CARLOS APACHE TRIBE,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

---

2010-5102

---

Appeal from the United States Court of Federal Claims in Case No. 09-CV-046, Senior Judge Robert H. Hodges, Jr.

---

NEWMAN, *Circuit Judge*, dissenting.

For decades the United States stood together with the San Carlos Apache Tribe, in federal and state court, pressing the position that the 1935 Globe Equity Decree did not finally determine the Tribe's water rights in the Gila River. When the issue was resolved in 2006 in the Arizona Supreme Court, and the Tribe's water rights were finally lost, the Tribe filed a claim for monetary damages in the Court of Federal Claims. In that court, for the first time, the United States took the position that the claim became time-barred six years after the Globe Equity Decree of 1935. The government now argues, and my colleagues now agree, that the Tribe was required to file this suit for the value of the lost water rights, before the water rights had been finally lost

and before any claim for damages arose. The court holds that this Tucker Act claim became time-barred in 1941, although its premises did not arise until the Arizona Supreme Court finally resolved the water rights issue in 2006. Thus this court provides "yet another instance of the manifest injustice which has assailed the Tribe at virtually every turn since their dealings with the United States and its citizens began." *United States v. Gila Valley Irrigation Dist.*, 804 F. Supp. 1, 5 (D. Ariz. 1992). I respectfully dissent.

## DISCUSSION

The history of the Gila River water allocation supports the position that the 1935 Decree did not represent the interests of the Tribe.

The San Carlos Apache Indian Reservation, established in 1872 in east central Arizona, is the remnant homeland of approximately 14,000 Tribal members. The Gila River provides Tribal members with water to grow crops and sustain themselves. In 1873, 1874, 1876, 1877, and 1902, the United States stripped out of the Reservation major parcels of land including valuable bottomlands along the Gila River, transferring these lands to settlers who began diverting water from the River. In 1924 construction began of the Coolidge Dam on the Gila River, flooding nearly 22,000 acres of the most valuable remaining Reservation bottomlands. No storage water rights in the impoundment were provided to the San Carlos Tribe; all such rights were dedicated to other water users.

In 1925 the United States initiated the Globe Equity proceeding in the United States District Court for the District of Arizona, to allocate Gila River water rights for the San Carlos Apache Tribe, the Pima Indian Tribe, and

others including settlers and farmers. The San Carlos Tribe was not a party to the proceeding and did not participate in the negotiations, while the United States ostensibly represented the San Carlos Tribe as "trustee." The Superintendent of the San Carlos Agency expressed strong opposition to the terms of the Decree and its adverse impact on the San Carlos Tribe, but his protests were ignored. *San Carlos Apache Tribe v. United States*, No. 09-46 (Fed. Cl. Jan. 23, 2009) ("Complaint"), ¶ 36. Other United States officials, such as the Special Assistant to the Attorney General, pressed the position that the United States should not support the San Carlos Tribe's superior priority to Gila River water. *Id.* ¶ 38. The resultant 1935 Globe Equity Decree allocated 6,000 acre feet of annual irrigation water to the San Carlos Tribe, amounting to less than two percent of the water allocated in the Decree. In contrast, the Pima Indians Gila River Community was allocated 210,000 acre feet of Gila River annual irrigation water. The record states that this differential treatment was rationalized because "the Pimas are an industrious farming race [while] the Apache are and always have been warlike and in no sense agrarian." *Id.* ¶ 39. Non-Indian interests were allocated over 350,000 acre feet of annual irrigation water. As a result, the Gila River in the San Carlos Reservation is frequently reduced to a trickle and consists mostly of salt-laden irrigation return flows unsuitable for use. *Id.* ¶ 33.

In 1979 the San Carlos Apache Tribe filed suit in the United States District Court in Arizona, asserting federal reserved water rights (called *Winters* rights) in the Gila River and tributaries, based on the ruling in *Winters v. United States*, 207 U.S. 564 (1908), that when the federal government creates an Indian reservation, it "impliedly reserve[s] a right to the amount of river water necessary to effectuate the purpose" of the reservation. *Nevada v. United States*, 463 U.S. 110, 116 n.1 (1983); *see also Arizona v.*

*California*, 373 U.S. 546, 600 (1963) ("The Court in *Winters* concluded that the Government, when it created that Indian Reservation, intended to deal fairly with the Indians by reserving for them the waters without which their lands would have been useless.").

The Tribe's suit reached the Supreme Court, which held that the Tribe should pursue its *Winters* claims in Arizona state court, stating that:

> The McCarran Amendment, as interpreted in *Colorado River,* allows and encourages state courts to undertake the task of quantifying Indian water rights in the course of comprehensive water adjudications. Although adjudication of those rights in federal court instead might in the abstract be practical, and even wise, it will be neither practical nor wise as long as it creates the possibility of duplicative litigation, tension and controversy between the federal and state forums, hurried and pressured decisionmaking, and confusion over the disposition of property rights.

*Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 569 (1983). Thus in 1985 the Tribe filed federal reserved water rights claims in Arizona state court, asserting that the Tribe was entitled to 129,710 annual acre feet of water from the Gila River system, based on *Winters* rights. The United States filed a separate claim in the Arizona state court "on behalf of the San Carlos Apache Indian Tribe," asserting "Federal reserved water rights" as the basis of the claim. Statement of Claimant Form, *In re: The General Adjudication of all Rights to use Water in the Gila River Sys. and Source*, File No. 39-64259 (Ariz. Super. Ct. 1985). The United States further stated that "Until the federal court with jurisdiction over the Gila decree of 1935 finally deter-

mines the scope of that decree and the *res judicata* effect of that decree, the United States considers this claim to be an appropriate part of the Tribe's reserved water rights claim." *Id.*

In 2001 various parties, apparently served by Gila River water, moved the Arizona state court for dismissal on the ground that the Tribe's claims, and the federal government's claims on behalf of the Tribe, were *res judicata* based on the 1935 Globe Equity Decree. In response the United States stood with the Tribe, and argued that the Tribe is entitled to a trial on the adequacy of United States representation in the Globe Equity Decree, based on due process considerations. *See* U.S. Br. 80-81, *In re: The General Adjudication of all Rights to use Water in the Gila River Sys. and Source*, No. WC-02-0003-IR (Ariz. 2005) ("[W]e agree with the Apaches that a remand for further proceedings would be appropriate. Among other things, to determine whether the United States exercised 'due diligence and reasonable prudence' in prosecuting the Globe Equity Decree on behalf of the Apaches."). The United States and the Tribe argued that the Globe Equity Decree did not extinguish the Tribe's *Winters* rights. *Id.* at 31.

The Arizona Supreme Court held that the Globe Equity Decree of 1935 "precluded" the continuing existence of preserved aboriginal or *Winters* rights for the Tribe. The Arizona court explained that the claim was precluded although the issue was not litigated and the Globe Equity Decree did not mention federal reserved or aboriginal water rights. *In re: The General Adjudication of all Rights to use Water in the Gila River Sys. & Source*, 127 P.3d 882, 888-95 (Ariz. 2006) (holding the San Carlos claim precluded as to the mainstem waters but not the tributaries of the Gila River). The Arizona Supreme Court declined to inquire into the questions of privity and the adequacy of the United

States' representation of the Tribe in connection with the Globe Equity Decree, holding that such an inquiry was barred by "the doctrine of comity." *Id.* at 898.

The Arizona court declined to review the challenges to the Decree by both the Tribe and the United States, stating that the issue of inadequate representation should be brought "in the forum responsible for issuing, interpreting, and enforcing the Decree," *id.* at 900, and that its merits could not be explored in state court – ignoring the ruling of the United States Supreme Court that the Tribe and the federal government should pursue in state court the claims that they had raised in federal court. In declining to consider the Tribe's arguments based on inadequate representation, the Arizona Supreme Court "express[ed] no opinion as to what other remedies, if any, might be available to the Tribe for the Government's allegedly inadequate representation." *Id.* at 901 n.21 (citing *Arizona v. California*, 460 U.S. 605, 628 n.20 (1983) ("noting that 'in an appropriate case the Tribes' remedy for inadequate representation by the government may lie in the Court of Claims'")).

Nonetheless, this court today holds that all of the Tribe's rights were fully, definitively, and finally resolved in 1935, and that the claim for damages under the Tucker Act, although it could not have been brought in 1935, nonetheless expired six years thereafter. My colleagues bar the Tribe from exploring the events surrounding the 1935 Decree, although until the Arizona Supreme Court in 2006 finally disposed of the question, the United States had itself challenged the comprehensiveness and binding effect of the Globe Equity 1935 Gila River allocation.

The Arizona Supreme Court decision finally ended the Tribe's claims to historic and adequate (*Winters*) water rights, rights that had been the subject of decades of dispute

and litigation. No monetary claims were extant, for the Tribe's concern was access to Gila River water. Until the present case, there was no monetary claim against the government, and thus no cause of action under the Tucker Act.

Precedent illustrates that monetary claims do not accrue against the United States until the claims have sufficiently ripened. In *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988), this court held that "a cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence," in that case a Tucker Act claim for breach of trust with respect to an Indian tribe. In *Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed. Cir. 2005), this court held that "the Samish claims did not accrue until the Samish, through their administrative challenges, obtained a final ruling by a district court under the APA," the court explaining that: "A claim accrues under [Tucker Act] § 2501 'when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" (quoting *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc)).

The San Carlos Tribe's claim for water rights was not resolved until the Arizona Court held in 2006 that the Tribe's rights in the main stem of the Gila River were controlled by the Globe Equity Decree but that the Decree did not govern the tributaries. The United States had argued in Arizona that the Globe Equity Decree did not extinguish the Tribe's *Winters* rights. *See* U.S. Br. 31 (Ariz. 2005) ("In the present adjudication, the United States filed a statement of claimant on behalf of the Apaches asserting rights in the upper Gila River watershed beyond the rights

(just noted) that are recognized in the Globe Equity Decree . . . In asserting these claims, the United States relies on the doctrine of federally reserved water rights. *See Winters v. United States*, 207 U.S. 564 (1908).")．The United States pointed out that the Decree states a priority date of 1846, which does not match the date of the founding of the San Carlos Reservation (1872), as it would if the Decree were based on *Winters* rights. *Id.* at 30; *Arizona v. California*, 373 U.S. at 600 (*Winters* rights are effective "as of the time the Indian Reservations were created.").

The United States also stated in the Arizona litigation that "the provisions in the Globe Equity Decree relating to the Apaches' rights are unconventional" and "have been subject to continuing controversy from their inception." U.S. Br. 29 (Ariz. 2005). The arguments by the United States in the Arizona litigation demonstrate that the controversy was continuing, and was generally understood to be continuing. Only after the water rights claim was finally lost in 2006, did a cause of action for monetary damages start to accrue. Until then, there was no ripened Tucker Act claim. The statute of limitations as to a claim in the Court of Federal Claims could not have started to run in 1935.

The case of *Catawba Indian Tribe of South Carolina v. United States*, 982 F.2d 1564 (Fed. Cir. 1993), relied on by the panel majority, is too remote, in fact and law, to govern this case. In *Catawba* this court held that the statute of limitations barred suit to recover certain lands or the value thereof, lands that had been removed from the Tribe by a 1959 statute (effective in 1962) that the Supreme Court ruled to be unambiguous on its face and "unmistakably clear" in *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 505 (1986). This court held that the statute of limitations accrued from the date of the 1959/1962 statute, or, at the latest, from 1972 when the ten-year period of

adverse possession of the lands had run. *Catawba*, 982 F.2d. at 1571. In *Catawba* the United States refused to recognize the lands as belonging to the Tribe, whereas for the San Carlos water rights the United States supported the Tribe's claim, and the water rights issue was acknowledged by the Supreme Court to be unresolved when the issue was consigned to the Arizona courts for resolution.

Only after the highest court of Arizona ruled in 2006 that the Decree would be held operative against the Tribe to the preclusion of *Winters* rights, were the federal reserved and aboriginal water rights resolved. This is not a "tangential legal question," as the government now argues, U.S. Br. 27, but the core determinant of a claim for damages, a claim that accrued only after Arizona ruled that the water was finally lost. The 2006 Arizona ruling is akin to the threshold determination in *Samish Indian Nation*, 419 F.3d at 1373, where this court held that until wrongful action was shown to exist, the statute of limitations could not start to run against a Tucker Act suit for compensation for such wrongful act. The Samish Nation was required to obtain a determination of wrongfulness in the district court. In both cases, the statute of limitations could not start to run until an essential premise of the claim was resolved. *See id.* at 1369 ("If a necessary element to a claim must be established in a different forum, the claim will not accrue for § 2501 until that element is finally established in the other proceeding."). *Cf. White Mountain Apache Tribe v. Clark*, 604 F. Supp. 185, 190 (D. Ariz. 1984) (dismissing the Tribe's federal claims as premature until the Tribe's water rights were determined in the Arizona state forum).

The San Carlos Tribe has persistently argued that it was not adequately represented in connection with the 1935 Decree, and in the Arizona courts the United States urged

that the Tribe was entitled to a hearing on this issue, stating:

> [W]e support the Apaches' request for a remand to the Superior Court for further proceedings on the Apaches' argument under Section 42(1)(e) of the Restatement (Second) of Judgments. . . .  As we explained, under controlling precedent of the Ninth Circuit, the inadequate representation exception to res judicata, as set out in Section 42(1)(e) of the Restatement (Second) of Judgments is available to the Apaches.  The Apaches clearly raised this exception in the proceedings below and the Superior Court clearly failed to address it, either on the law or facts . . . there is no denying that the Superior Court gave the Apaches' arguments short shrift.

U.S. Reply Br. 62, 70, *In re: The General Adjudication of all Rights to use Water in the Gila River Sys. and Source*, No. WC-02-0003-IR (Ariz. 2006).  Until the Arizona Supreme Court declined to decide this issue, the binding effect of the Global Equity Decree remained in contention, for precedent supports the Tribe's argument that since it was not a party, and since it was inadequately represented, it was not bound.  *See United States v. Truckee-Carson Irrigation District*, 649 F.2d 1286, 1307 (9th Cir. 1981) ("When the government breaches its trust to the Tribes while openly advancing its own interest the Tribe is not necessarily bound . . . such a limitation to preclusion based on due process is proper.").

"Because of its treaty and statutory obligations to tribal nations, the United States must be held to the most exacting fiduciary standards in its relationship with the Indian beneficiaries." *The Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1348 (Fed. Cir. 2004); *see generally Nevada v. United States*, 463 U.S. at

127 ("This Court has long recognized the distinctive obliga-tion of trust incumbent upon the Government in its dealings with Indian tribes."). Basic principles of due process and fiduciary obligations establish that inadequate representa-tion by a trustee renders the action non-binding on the purported beneficiary. *See* Restatement Second of Judg-ments §42(1)(e) (1982) ("A person is not bound by a judg-ment for or against a party who purports to represent him if . . . The representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent."). *Cf. Pelt v. Utah*, 539 F.3d 1271, 1284-89 (10th Cir. 2008) (Navajo beneficiaries of oil and gas royalty fund administered by the state, requesting an accounting, were not bound by previous class actions to which these benefici-aries were not parties, since their interests were not ade-quately represented as required by due process, for the absent beneficiaries' interests were not "vigorously pursued and protected"). These principles further impugn the final-ity of the 1935 Decree as to the Tribe, for, as stated in *Hopland Band of Pomo Indians*, "[t]he general rule is that the statute of limitations 'does not run against a beneficiary in favor of a trustee until the trust is repudiated and the fiduciary relationship is terminated.'" 855 F.2d at 1578 (quoting *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238, 1249 (N.D. Cal. 1973)).

In the analogous case of *Fort Mojave Indian Tribe v. United States*, 23 Cl. Ct. 417 (1991), aff'd, No. 95-5014, 1995 U.S. App. LEXIS 23960 (Fed. Cir. 1995), the Fort Mojave Tribe sought damages for loss of water rights due to alleg-edly inadequate representation by the United States as trustee in litigation leading to a 1964 consent decree. The government argued that the Tribe's claim for damages accrued with the 1964 decree and thus was barred by the statute of limitations. The Court of Federal Claims held,

and this court affirmed, that the Tribe's claim did not accrue until 1983, when the Supreme Court, in *Arizona v. California*, 460 U.S. 605 (1983), finally interpreted the rights established by the 1964 decree.

In *Fort Mojave*, as in this case, the United States had stood together with the Tribe in litigation attempting to secure additional water rights for the Tribe, and the United States had acted as trustee for the Tribe in entering the earlier consent decree. The Claims Court reasoned: "Since the ultimate outcome of the United States' continuing trust actions (both pre- and post-1963) remained very much in doubt until the Supreme Court's 1983 decision, 'all the events' which fixed liability for a breach of trust had not occurred until the issuance of that decision." *Fort Mojave*, 23 Cl. Ct. at 429. The court pointed out that the government's position "would demand that plaintiffs file their breach of trust action at a time when, rather than assuming a position adverse to plaintiffs' interests, the United States had acknowledged its error and was working hand in hand with plaintiffs in an effort to redress that error." *Id.* at 431.[1] This reasoning remains apt, along with the court's observation that no precedent supported the government's position that the action for damages was time barred under such circumstances. *Id.* As this court explained in *Bayou Des Familles Dev. Corp. v. United States*, 130 F.3d 1034,

---

[1]The panel majority states that the Tribe waived this line of argument in the Court of Federal Claims. Maj. Op. at 16. That is contrary to the record. *See* Pl.'s Resp. to Def.'s Mot. to Dismiss at 26, *San Carlos Apache Tribe v. United States*, 09-46 (Fed. Cl. Jun. 23, 2009) ("[I]f the Tribe had brought the present monetary damages claim before 2006, the U.S. would no doubt have argued that the claim was not ripe as the Tribe and the U.S. were both seeking to obtain additional water rights for the Tribe in the Gila Adjudication, [and] claims for these additional water rights were unresolved.").

1038 (Fed. Cir. 1997), "Starting the statute of limitations clock" occurs when the "claim become[s] ripe for adjudication." *See also* Corman, *Limitation of Actions*, § 6.1, p. 374 (1991) (a claim does not accrue until all events necessary to fix the liability of the defendant have occurred).

The path of precedent is clear.  The San Carlos Apache claim for damages did not ripen until 2006, when the water rights were finally adjudicated.  As observed *ante*, in *Arizona v. California*, 460 U.S. at 628 n.20, the Court noted that "in an appropriate case the Tribes' remedy for inadequate representation by the Government may lie in the Court of Claims."  That is the present situation: the issue of water rights was finally resolved by the Arizona Supreme Court in 2006, thereby ripening the claim for monetary damages.  From my colleagues' ruling that this claim arose in 1935 and became barred six years later, I must, respectfully, dissent.